UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61589-CIV-ALTMAN/Hunt

**T&G CORPORATION**,

 *Plaintiff*,

v.

**UNITED CASUALTY & SURETY
INSURANCE COMPANY**,

 *Defendant*.

_____/

## ORDER

  The Plaintiff, a general contractor, sued the Defendant, its subcontractor's surety, in state court after the subcontractor defaulted and the surety (allegedly) failed to fulfil its obligations under the contract. Because the two parties—Plaintiff and Defendant—are diverse, and given that the case involves hundreds of thousands of dollars, the surety removed the action to this Court. The Plaintiff now wants to join the subcontractor as a second defendant. The problem, of course, is that the subcontractor is—like the Plaintiff—a citizen of Florida. Since there's no federal question here, the subcontractor's appearance would force the Court to remand the case to state court.

  Federal courts admittedly review these kinds of requests with suspicion. Often, the plaintiffs have no legitimate reason—other than remand—to add the non-diverse defendants. Here, though, the Plaintiff did have a good reason for leaving the subcontractor out of the original complaint. When the Plaintiff first sued the Defendant in state court, all indications were that the subcontractor would enter bankruptcy. The Plaintiff thus justifiably feared that the bankruptcy court's ensuing stay would preclude its claims against the subcontractor. Since then, however, the subcontractor (who didn't end up declaring bankruptcy) demanded payment from the Plaintiff—a demand it's been unwilling to set aside. Some portion of that demand includes the very same payment the Defendant is here seeking to

"offset" against the Plaintiff's potential damages. The Plaintiff also owes the subcontractor money on another project. That wouldn't matter much except that the governing subcontracts contain "cross-default" provisions, which appear to allow the Plaintiff to "stack" the balance from one project on top of the other. This is important because, without this "stacking," the Plaintiff would be subject to a stringent damages cap that *could* sharply curtail its recovery in this case.

If this all sounds a bit confusing, that's because it is. This case straddles the muddled intersection between several complex contractual provisions signed by three different parties—all of whom should be permitted to resolve their outstanding issues in *one* case, rather than in two separate cases. Unfortunately for the Defendant, that means this case cannot proceed in federal court. As this summation makes plain, the Plaintiff's motion for leave to amend its complaint, to add a non-diverse defendant, and to remand is **GRANTED**.

## BACKGROUND

The Plaintiff, T&G Corporation, d/b/a T&G Constructors ("T&G"), entered into a contract with the School Board of Broward County to renovate the Morrow Elementary School building in Broward County, Florida (the "Morrow Project"). *See* Compl. [ECF No. 1-3] ¶ 5. T&G subcontracted the electrical work on the project to Celeiro Electrical Contractor LLC ("Celeiro"). *Id.* ¶ 6. The Morrow Subcontract required Celeiro to obtain two bonds from the Defendant, United Casualty & Surety Company. *Id.* ¶ 7. Those bonds, which named T&G as obligee and beneficiary, required the Defendant (1) to "pay in full for all losses, damages, expenses, costs, and attorney's fees, including all appellate proceedings, that [T&G] sustains because of a default by [Celeiro] under the Subcontract," and (2) to "pay in full all claimants . . . and to indemnify [T&G] for all damages attorney's fees and costs it incurred, or will incur." *Id.* ¶¶ 7, 12, 23. We refer to these obligations, respectively, as the "Performance Bond" and the "Payment Bond"—together, simply, "the Bonds."

In July of 2020, T&G filed this Complaint against the Defendant in state court, alleging that the Defendant failed to fulfill its obligations under the Bonds after Celeiro defaulted on the Morrow Subcontract. *Id.* ¶¶ 13–14, 16, 24. Relying on this Court's diversity jurisdiction, the Defendant removed the case on August 5, 2020, *see* Notice of Removal [ECF No. 1] ¶ 5. Once in federal court, the Defendant answered with counterclaims of its own, alleging that (1) T&G owed the Defendant for claims the Defendant had paid out under the Payment Bond, *see* Answer and Counterclaim [ECF No. 6] ¶¶ 7–8, and that (2) as subrogee to Celeiro's contractual rights, the Defendant was entitled to certain offsets and attorneys' fees under the Morrow Subcontract, *see id.* ¶¶ 9–18.

A few days after the Court entered a Scheduling Order [ECF No. 12], T&G moved to amend the Complaint to add Celeiro as a defendant. *See* Motion for Leave to Amend to Add Non-Diverse Defendant and Remand ("Motion") [ECF No. 14]. Because Celeiro, like T&G, is a citizen of Florida, the proposed amendment would strip the Court of subject-matter jurisdiction and compel a remand to state court. *See id.* ¶¶ 1, 8.

In support of the Motion, T&G says that it didn't name Celeiro in the original Complaint because, at the time, it believed that Celeiro would enter bankruptcy—just as Celeiro's principal, Roberto Celeiro Albar, had done. *Id.* ¶ 2. Moreover, according to T&G, after Mr. Albar's bankruptcy, Celeiro began demanding payment for work it had completed on the Morrow Project. *Id.* ¶ 3. This, in turn, is the very same money the Defendant is now seeking to offset as Celeiro's subrogee in this case. *Id.* T&G would thus prefer to include Celeiro as a co-defendant because, otherwise, T&G could find itself in the unenviable position of having to defend itself against identical claims in two different fora. *Id.* at 5. What's worse, T&G notes that Celeiro is also demanding payment for work it completed on *another* project—renovations at the Tamarac Elementary School (the "Tamarac Project"). *See* Reply at 2. And, T&G says, this second claim—which T&G doesn't really dispute—is subject to a "cross-default" provision that, in essence, permits outstanding claims from the Morrow and Tamarac Projects

3

to be calculated together. *See* Affidavit of Joe Easton ("Easton Aff.") [ECF No. 16-1] ¶ 4. This claim agglomeration is important because it would (theoretically) allow T&G to exceed the Performance Bond cap of $404,000 that would otherwise govern T&G's claims against the Defendant. *See* Hearing; *see also* Performance Bond, No. UCSX372X1063, Document 00620 ("Performance Bond") [ECF No. 14-3], Ex. 2-A, at 1.

The Defendant, of course, would prefer to stay here, in federal court. In its view, T&G has no real claims against Celeiro—as evidenced by T&G's decision not to sue Celeiro in the first instance. *See* Defendant's Response in Opposition to Plaintiff's Motion for Leave ("Response") [ECF No. 15] ¶¶ 1, 2, 18–20. And, given that T&G filed its Motion soon after removal—but before any discovery had taken place—the Defendant insists that T&G is using the specter of an unlikely Celeiro claim to get what it really wants: a remand to state court. *Id.* The Defendant also tries to parry T&G's thrusts by pointing out that Celeiro had not actually filed for bankruptcy in July of 2020—and, therefore, could have been sued, *see id.* ¶ 20; that this case could easily proceed without Celeiro both because T&G has its own case files and because any Celeiro-centric evidence could be obtained through third-party discovery, *see id.* ¶ 27; that T&G won't be prejudiced by Celeiro's absence because the Defendant is solvent and can satisfy any adverse judgment, *see id.* ¶ 28; that T&G can still sue Celeiro in state court, *see id.* ¶ 29; that T&G's proposed amended complaint doesn't seek a declaratory judgment—and so, doesn't actually dispute that Celeiro is entitled to the offsets, *see id.* ¶ 30; and that Celeiro is willing to release any claims it may have against T&G, *see id.* ¶ 31. In support of this final contention, the Defendant appends as an exhibit a September 15, 2020 email that one of its lawyers sent to T&G, copying one of Celeiro's lawyers and purporting to memorialize Celeiro's willingness to release its claims against T&G. *See id.* at Ex. 1-A.

The Court held a hearing on January 28, 2021, at which the parties presented their oral arguments. *See* Jan. 28, 2021 Hearing ("Hearing") [ECF No. 23]. As relevant here, the parties

represented that, as of the date of the hearing, Celeiro had neither released its claims against T&G nor otherwise confirmed its willingness to do so. This Order follows.

## THE LAW

Because the Motion seeks both joinder and remand, it isn't governed by the liberal pleading standard of FED. R. CIV. P. 15(a)(2), which instructs courts to grant leave freely when "justice so requires." Instead, in resolving the Motion, this Court must look to 28 U.S.C. § 1447(e), which provides, in pertinent part, as follows: "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court."

The Court therefore has two options: deny joinder or permit it and remand the case. *See Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 862 (11th Cir. 1998). Four factors—referred to as the *Hensgens* factors—guide this decision: "(1) the extent to which the purpose of the amendment is to defeat federal jurisdiction; (2) whether [the movant] has been dilatory in asking for the amendment; (3) whether [the movant] will be significantly injured if the amendment is not allowed; and (4) any other factors bearing on the equities." *Simon v. Howmedica Osteonics Corp.*, 981 F. Supp. 2d 1232, 1237 (S.D. Fla. 2012) (citing *Hensgens v. Deere & Co.*, 833 F.2d 1179, 1182 (5th Cir. 1987)). Although the procedural choice is a binary one, the Court has "broad discretion in weighing these factors" and in deciding which route to take. *See Dever v. Family Dollar Stores of Ga., LLC*, 755 F. App'x 866, 869 (11th Cir. 2018).

## ANALYSIS

This is a close call. The Defendant's arguments are well-taken, and some of T&G's actions—in particular, its failure to include a declaratory-judgment count in its proposed amended complaint—smell of forum-shopping. In the end, though, T&G has shown that joining the three parties together in one case will be the most efficient way of litigating the various competing interests while avoiding

the pitfalls of parallel—and duplicative—litigation. The *Hensgens* factors, in short, favor joinder. We review each in turn.

*First*, the purpose and timing of the Motion. Generally, it's true, courts are suspicious of a plaintiff's efforts to join a non-diverse defendant *after* removal—but *before* any discovery has been taken—particularly where, as here, the plaintiff knew about the non-diverse defendant all along. *See, e.g.*, *Alleyne v. Am. Sec. Ins. Co.*, 2011 WL 12711451, at *3 (S.D. Fla. Apr. 12, 2011). But "[t]he mere fact that the requested amendment would divest the Court of its jurisdiction does not, in itself, establish that Plaintiff's motive in seeking amendment is to accomplish this aim." *Fiddler's Creek Cmty. Dev. Dist. 2 v. U.S. Bank Nat'l Ass'n*, 2012 WL 2358295, at *3 (M.D. Fla. June 20, 2012). And T&G did have a good reason not to sue Celeiro in state court: all indications were that Celeiro was going into bankruptcy, *see* Motion ¶ 2, where the bankruptcy court's automatic stay would have precluded T&G's claims, *see* 11 U.S.C. § 362(a). And, while Celeiro didn't ultimately declare bankruptcy, it (notably) did begin seeking payments from T&G on the Morrow Subcontract, *see* Motion ¶ 3—thus giving T&G a *new* (and valid) reason to add Celeiro to the case.

The Defendant asks the Court to ignore these Celeiro developments because (it says) Celeiro is willing to release its claims against T&G. We address this issue in more detail below and explain why the Defendant's release argument isn't persuasive. The point here, though, is that, even if this were true—even if Celeiro did intend to release T&G—the Defendant only sent T&G "confirmation" of Celeiro's intent in a September 15, 2020 email, two weeks *after* T&G filed this Motion (and just two days before the Defendant responded). *See* Response at Ex. 1-A. In other words, T&G didn't know about Celeiro's (purported) willingness to release its claims until *after* T&G filed the Motion—a sequence of events that strongly undermines the Defendant's position that the Motion is purely a tactic to defeat jurisdiction. In short, when Celeiro began demanding payment, T&G could have reasonably believed that it faced parallel state-court litigation over the same contractual offsets. And,

even according to the Defendant's telling, T&G had no reason to think that Celeiro was willing to release those claims. T&G thus had legitimate reasons—having nothing to do with stripping this Court of jurisdiction—for moving to add Celeiro after removal.[1] This first factor, then, weighs in favor of joinder.

*Second*, T&G didn't create any unnecessary delay—nor could its pace be characterized as "dilatory." *See, e.g.*, *Simon*, 981 F. Supp. 2d at 1237 (courts should consider whether the plaintiff was "dilatory" in seeking joinder). Indeed, it filed this Motion on September 3, 2020, *see* Motion—well within the Court's amended pleading deadline, *see* Scheduling Order (setting an amended pleading deadline of October 19, 2020). This second factor likewise militates in favor of joinder.

*Third*, T&G would be prejudiced if it were prohibited from joining Celeiro to this case. Here, again, we focus on the threat of parallel litigation. As the Middle District of Alabama explained in *Godwin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2006 WL 3924795, at *2 (M.D. Ala. Dec. 15, 2006), "the burden of having to prosecute two separate lawsuits is a significant injury which, although it does not mandate allowing the amendment, weighs in favor of permitting the joinder." The Defendant

---

[1] This case is therefore distinguishable from the cases the Defendant cites, in which the plaintiffs were—quite transparently and without valid justification—trying to undermine the courts' jurisdiction. Take *Vazquez v. Lowe's Home Centers, Inc.*, 2007 WL 128823 (M.D. Fla. Jan. 12, 2007). There, the plaintiff sued Lowe's in state court after she slipped and fell in a Lowe's store. *Id.* at *1. After Lowe's removed the case, the plaintiff sought to join two non-diverse Lowe's employees as co-defendants. *Id.* Notably, there was no evidence that the employees were, as here, demanding payments from the plaintiff or threatening to countersue her—nor was there any claim that the plaintiff and the employees were engaged in some ongoing commercial relationship. *See generally id.* There was also no evidence that anything happened *after removal* to change the plaintiff's calculus. There were thus no moving parts or subsequent developments in the case—as there are in this case—that could have triggered the need to join the employees (other than the plaintiff's desire to return to state court).

The same is true of *Gil v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 7796182 (S.D. Fla. Apr. 24, 2017), where a driver injured in a car accident sued her insurer for payment under the policy. *Id.* at *1. When the insurer removed, the plaintiff sought to join the driver who'd hit her. *Id.* As in *Vasquez*, nothing had happened after removal to change the plaintiff's relationship to the other driver. She had all along known who he was and how he was responsible for her injuries. Nor did she have any *new* reason to join him after removal. Here, by contrast, the relationship between T&G and Celeiro continues to evolve, and T&G has given valid reasons for its post-removal request.

7

contends that T&G will suffer no prejudice because (1) Celeiro intends to release its claims against T&G, and (2) even without a release, the Defendant's rights to the offsets are superior to Celeiro's. *See* Response ¶¶ 31–32. But the only evidence the Defendant has adduced for Celeiro's purported interest in releasing its claims against T&G is an email from *the Defendant's* lawyer—an email that, as the Defendant now concedes, Celeiro has *never* confirmed. In fact, as of this writing, Celeiro still hasn't released its claims against T&G—nor has it even responded to T&G's separate email, in which T&G's lawyers asked Celeiro's lawyers whether the subcontractor was interested in releasing those claims. There is thus *no* evidence that Celeiro has released its claims against T&G. To the contrary, *all* the evidence suggests that, despite many opportunities, Celeiro has *refused* to release its claims—a refusal that presents T&G with the very real threat of dual litigation. And this possibility weighs strongly in favor of joinder. *Compare Alleyne*, 2011 WL 12711451, at *3 (denying joinder where "[t]he risk of multiple litigation arising from this matter is small"). In this last respect, the Defendant's assurance that, because of its own subrogation rights—by which its claims to the offsets (apparently) supersede Celeiro's—T&G would be likely to win any such state lawsuit must come as little consolation to the Plaintiff. After all, even if the Defendant is right, the Plaintiff would still have to pay lawyers to litigate identical claims in two different fora—a needless outlay of time and money, however the state case turns out.[2]

The "cross-default" provisions in the Morrow and Tamarac Subcontracts provide still another reason for joinder. T&G faces a hard cap of $404,000 on any damages it might recover on the Performance Bond from the Morrow Project.[3] *See* Reply at 7; *see also* Hearing. Since T&G believes

---

[2] This inequity is, of course, one-sided, because the Defendant would never have to participate in any parallel state litigation—and thus has only to gain from forcing T&G to divide its resources (and attention). For this reason, the fourth *Hensgens* factor—"any other factors bearing on the equities"—likewise favors joinder.

[3] We focus here on the Performance Bond because, at the Hearing, the parties seemed fairly confident that their dispute over the Payment would (very likely) be resolved. *See generally* Hearing.

that Celeiro—and, by extension, the Defendant—owes it far more than $404,000, T&G stands to lose money on this litigation, even if it prevails. But, T&G says, there's an easy way for it to come closer to breaking even. T&G apparently owes Celeiro money for work the subcontractor performed at the Tamarac Project. *See* Reply at 7; *see also* Hearing. Why does that matter? Because the "cross-default" provisions in the two Subcontracts allow T&G and Celeiro to net out, as it were, their various debits and credits from the *two* projects on *one* balance sheet. *See* Hearing. T&G refers to this process as "stacking," and a simple illustration may underscore its significance here.

Imagine that, at the end of the day, the Defendant owes T&G $500,000 on the Performance Bond from the Morrow Project. Given the damages cap, however, the Defendant would only have to pay T&G $404,000—leaving T&G to try to collect the remaining $96,000, if it can, from Celeiro in a separate state-court case. But, from T&G's perspective, there are two problems with this strategy. The first is that Celeiro—whose principal has recently sought bankruptcy protection—may not have the money. The second is that pursuing Celeiro for the balance would require T&G to pay its lawyers what will likely amount to tens of thousands of dollars—litigation isn't cheap these days—to file and prosecute that second case. This second problem is exacerbated by the fact that T&G apparently owes Celeiro some $80,000 on the Tamarac Project. At best, then, T&G's separate claim against Celeiro might net it something in the range of $16,000—a meager sum T&G isn't likely to pay *any* lawyers (let alone the very expensive law firm it has retained) to pursue. So, how does adding Celeiro to this lawsuit help T&G mitigate its "losses?" The "cross-default," of course. That provision, remember, allows T&G to add a –$80,000 to its balance sheet with Celeiro (and, by extension, the Defendant) on the Morrow Project. With Celeiro in the case, then, T&G would start out at –$80,000—a deficit that would permit T&G to recover up to $484,000 from the Defendant under the Performance Bond's

9

damages cap.[4] Adding Celeiro to the case would thus net T&G—all things being equal—$80,000, without having to expend any additional time or money on parallel litigation.

Of course, the Court takes no position on how the Subcontracts operate or whether the facts as T&G presents them[5] are true. But these outstanding questions do reinforce the Court's view that there remain overlapping and unresolved issues between the *three* parties, which should be addressed in *one* case.

At the Hearing, the Defendant argued that the Tamarac Project really had nothing to do with its liability under the Morrow Project's Performance Bond. *See* Hearing. But that's hard to square with the Defendant's subrogation rights. *See* Response ¶¶ 31–32. If T&G is right about the effect of the "cross-default" provision—and, specifically, its "stacking" effect in the unique circumstances presented here—then the Defendant-as-subrogee may well be bound by that provision, just as, for example, it's entitled to stand in Celeiro's shoes and assert Celeiro's contract defenses. *See* Response at 11. But, again, the point is not whether T&G is right on the merits; the point is, rather, that T&G has a *colorable* contract-based argument that it can only advance if Celeiro is joined as a defendant. *See Wade v. Dolgencorp, LLC*, 2009 WL 8630725, at *2 (M.D. Fla. Oct. 14, 2009) ("Where a plaintiff states even a colorable claim against the resident [i.e., non-diverse] defendant, joinder is proper and the case should be remanded to state court." (quoting *Pacheco de Perez v. AT&T Co.*, 130 F.3d 1368, 1380 (11th Cir. 1998)).

The Defendant also suggested that any decision allowing Celeiro's joinder would unlock a frightening Pandora's box—chock full of hypothetical horribles. Chief among these, counsel warned, was a slippery slope of the if-now-then-always variety: if we permit joinder here, the argument goes,

---

[4] $404,000 – (–$80,000) = $484,000$.
[5] Viz., that T&G's damages exceed the Performance Bond cap, that T&G owes Celeiro money on the Tamarac Project, or that the Subcontracts allow T&G to "stack" its debt to Celeiro on top of the Performance Bond cap.

then general contractors will *always* join subcontractors as defendants in suits against sureties—a calamity that, the Defendant assures us, isn't remotely the norm. But we need not follow the Defendant into this worm hole. Who's to say that the parties' respective domiciles in future cases will align as they do here—eviscerating diversity? Or that these future actions will implicate restrictive damages caps for which the only salve may well be the contractor's *debt to* the subcontractor—a debt the contractor hopes to apply against the surety through a cross-default provision that *might* alleviate the greater part of the cap's burden? And will all such future cases involve a subcontractor who's demanded payment on two separate projects—only one of which implicates the rights of the surety as subrogee? More fundamentally, even if *all* such future cases turn on *all* these same facts—an unlikely prospect, to be sure—what is it about sending this narrow range of cases back to state court that so offends us? Surely, the sureties' *preference* for federal court shouldn't be viewed as some irrebuttable entitlement—an unprecedented federal-court privilege that overrides the strictures of Article III and § 1447(e). The upshot is that, where (as here) the general contractor—who's master of its complaint—has legitimate, post-removal reasons to add the subcontractor, and when (again, as here) the *Hensgens* factors favor joinder, the non-diverse subcontractor *should be* joined and the case *should be* remanded.

      The Defendant advances five additional arguments—all meritless. *First*, the Defendant insists that most of the evidence in the case should come from T&G's files, so we won't need Celeiro during discovery—and, even if we do, Celeiro could be subjected to third-party practice. *See* Response ¶ 27. To begin with, though, it isn't true that Celeiro will have little to add here. To the contrary, given that the dispute hinges to a large degree on how much work Celeiro did and how much that work cost, Celeiro's files—and, indeed, some choice depositions of Celeiro's employees—will likely play a crucial role in discovery. Why, then, would we relegate these questions to third-party discovery under Rule 45—as the Defendant suggests, *see id.*—when we can easily bring all the parties, including Celeiro, under one court's jurisdiction? The Defendant never answers this rather simple question.

11

*Second*, the Defendant assures us that it has more than enough capital to satisfy any adverse judgment—the supposition being that T&G wouldn't be prejudiced by Celeiro's absence. *See id.* ¶ 28. That may be true—but it's quite beside the point. T&G's prejudice would arise, not from the Defendant's default, but from T&G's inability to use the "cross-default" provisions to "stack" its damages from the Tamarac Project on top of the Morrow Performance Bond's damages cap.[6] And, as we've seen, the potential threat (and cost) of parallel—and duplicative—litigation with Celeiro only further highlights the scope of T&G's prejudice.

*Third*, the Defendant maintains that T&G could always just sue Celeiro in a separate action in state court, *see id.* ¶ 29, and that any overlapping issues could be worked out by an aggressive administration of issue preclusion and *res judicata*, *see* Hearing. But this is precisely what the *Hensgens* factors are meant to prevent. *See, e.g.*, *Godwin*, 2006 WL 3924795, at *2 (explaining that "the burden of having to prosecute two separate lawsuits is a significant injury"). T&G shouldn't have to litigate two interconnected lawsuits in two separate fora—incurring additional costs and fees—when it has advanced a viable basis for joinder. Issue preclusion and *res judicata*, moreover, don't operate *automatically*. The parties will inevitably have to litigate complex factual and legal questions, presumably after some robust discovery, to prevail under either doctrine—a logistical reality that renders the Defendant's proposed solution cumbersome and (at least so far as T&G is concerned) tremendously unfair.[7]

*Fourth*, the Defendant says that T&G's failure to include a declaratory-judgment count against Celeiro in its proposed amended complaint belies its true objectives. *See* Response ¶ 30. But it's not

---

[6] Again, the Court takes no position on whether the Subcontracts support this kind of liability stacking. But T&G has made a "colorable" claim that they do—and, if they do, then T&G *would be* prejudiced by Celeiro's absence.

[7] Unfair because (as we've said) the Defendant—unlike T&G—wouldn't have to participate in, or incur the costs of, that other lawsuit.

immediately clear that a declaratory judgment would be necessary to resolve the competing-offset question. Presumably, the offsets could get worked out in a final damages computation—a computation that could proceed just as well within the rubric of a contract claim. Even if a declaratory-judgment claim were the *best* way to resolve this issue, though, counsel for T&G has already agreed to add such a claim. *See* Hearing. And so, while it isn't necessary now, the Court will remand the case to state court, where T&G can (though it need not) assert a state-law, declaratory-judgment claim as appropriate.

*Fifth*, the Defendant downplays the significance of any joint-and-several liability it may share with Celeiro, noting that FED. R. CIV. P. 19 doesn't govern the analysis under § 1447(e). That's true, of course—but the point only *undermines* the Defendant's position because § 1447(e) is *more* permissive than Rule 19. In other words, in the context of § 1447(e), the non-diverse defendant need *not* be indispensable to be joined. *See Heininger v. Wecare Distribs., Inc.*, 706 F. Supp. 860, 862 (S.D. Fla. 1989) (explaining that the new defendant "need *not* be indispensable . . . in order for a district court to permit joinder and remand the action to state court" (emphasis added)); *see also Hensgens*, 833 F.2d at 1182 (concluding that the "balancing of these competing interests is not served by a rigid distinction of whether the proposed added party is an indispensable or permissive party"); *Mayes v. Rappaport*, 198 F.3d 457, 462 (4th Cir. 1999) ("Under Section 1447(e), the actual decision on whether or not to permit joinder of a [non-diverse] defendant . . . is committed to the sound discretion of the district court; thus, this decision is not controlled by a Rule 19 analysis."). The Rule 19 distinction thus adds little to the analysis.

***

For the foregoing reasons, the Court hereby **ORDERS** and **ADJUDGES** as follows:

1. T&G's Motion [ECF No. 14] is **GRANTED**.
2. T&G's First Amended Complaint [ECF No. 14-1] is deemed filed as of this Order.

3. The Clerk shall **REMAND** this case to the Seventeenth Judicial Circuit in and for Broward County, Florida.

4. The Clerk shall **CLOSE** this case. All pending deadlines are **TERMINATED**, and any pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 9th day of February 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record